REDMANN, Chief Judge.
Plaintiff appeals from the dismissal by summary judgment of his claim for damages from personal injury in an accident in May 1979.
Defendant corporation had had plaintiff’s employer install at defendant’s grain elevator, a 4,160-volt primary, 240-volt secondary electrical transformer, together with its wiring and a primary line switch (an “air transfer switch”), as an intended additional source of power. (An officer of the corporation was also made a defendant but is hereafter ignored.) The transformer had not yet been put into use when defendant telephoned plaintiff’s employer to send someone out to identify the “stinger leg” [1] on the transformer.
Plaintiff’s employer sent plaintiff, armed with a voltmeter. According to plaintiff, defendant’s employee led plaintiff to a locked box containing the air transfer switch (that turned on and shut off the 4,160-volt line that supplied power to the transformer[2]), unlocked the box, and said “This is it.”
The most important element in plaintiff’s injury is stated by him in deposition: “It was supposed to be a 480 volt transformer. As it turned out, it was 4,160.” Plaintiff believed that he was dealing with a transformer that was stepping 480 volts down to a lower voltage, rather than one that was stepping a higher voltage (4,160) down to 480 volts (twice the 240-volt leg to ground voltage; see n. 1). If this belief by plaintiff were correct, it would have made no difference that plaintiff was not competent to distinguish a transformer from the switch in the supply line to the transformer primary: plaintiff would not have injured himself if the highest voltage were only 480. But plaintiff’s belief was wrong, and the primary voltage was 4,160, and when plaintiff attempted to measure this voltage at the primary line switch his voltmeter exploded, causing his injury.
Plaintiff argues that defendant owed him a duty to lead him not to the switch to the transformer, but to the transformer itself, and that his injury was the result of the defendant’s breach of that duty. We cannot agree, and we cannot find any disputed issue of material fact that would prevent the summary judgment that was rendered.
Most important, when one calls the electrical contractor who installed a transformer and its switch and asks the contractor to send out a person to identify the transformer’s stinger leg, one reasonably expects that the contractor will send a person competent to do the job, an expert who shares the contractor’s expert knowledge and ability. In the absence of extraordinary circumstance, one cannot be held to owe a duty of care to an expert in the very area of the expert’s expertise. Thus, because no extraordinary circumstance was known to defendants, defendant had no duty to plaintiff to instruct plaintiff concerning electrical apparatus and voltages.
Moreover, if the voltmeter is the device to be used to distinguish the higher-voltage stinger leg, then electricity must be put in to the transformer in order for electricity to come out of the transformer so that the voltmeter can measure its voltage. It was not only reasonable but indispensable for defendant’s employee to lead the expert to the high-voltage line switch so that the transformer could be turned on. Thus defendant surely had no duty to plaintiff not to lead him to the switch to turn the transformer on.
*671 Finally, an expert who cannot tell the difference between a switch and a transformer may be equally incompetent to tell the difference between the input, high-voltage side of the transformer and the output, low-voltage side. (We repeat that apparently plaintiff believed that the high-voltage side would have only 480 volts.) Such an expert is as likely to hurt himself by touching the 4,160-volt side of the transformer (whose voltage is identical to that of the switch), and it cannot be said that “but for” defendant’s employee having led this inexpert expert to the switch (that had to be turned on anyway), plaintiff would not by his inexpertness have injured himself. Plaintiff was just as likely to injure himself at the transformer (which he apparently thought was stepping down 480 volts, rather than stepping down a higher voltage to 480) as at the switch leading to the transformer. Thus defendant’s action in leading plaintiff to the switch rather than to the transformer was not a substantial factor in the causation of plaintiff’s injuries.
One might conceive circumstances in which a supposed “expert” is so evidently incompetent as to impose a duty upon the person who employed the expert to protect the expert from his incompetence, such as evident drunkenness or other stupor. But no such circumstances are suggested here. The circumstances here include allegations by plaintiff (who was educated in aircraft mechanics but who had worked with electricity for 14 years) about his own inexpertness and inexperience in the electrical field (including that he had never seen an air transfer switch before), but no reason whatsoever for defendant to have known of plaintiff’s inexpertness or ignorance of the primary voltage.
The undisputed sad facts are that plaintiff’s employer, in response to a call for an expert to identify the stinger leg on the secondary of a 4,160-volt transformer, unfortunately sent out a person who was uninformed by his employer of the high primary voltage, had never worked with such high voltage, and was so inexpert that he hurt himself by applying a 1,000-volt meter across that 4,160 volt supply that he apparently believed was only 480 volts. For that, defendant was not at fault and therefore cannot be liable.
Affirmed.

. Plaintiff in deposition states: "On a 330 circuit, that would be your hottest leg. In other words, normally say you have 480 volts, you would read each leg to ground and normally it should be approximately half the voltage to ground, and your stinger leg reads a little bit higher than that. The reason they identify that is so that you don’t put some of your control circuits on anything, because your voltage is a little higher that way, so you try to isolate that.”

. Defendant’s electrician foreman by deposition states that "the main power comes from the [Louisiana Power & Light Company] supply ... then it goes to this air transfer switch ..., then in turn it goes from the transfer switch to the transformer where it’s broken down to smaller voltages_”